IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

DIVISION II

| | |
|---|---|
| CELESTE RYAN,<br><br>               Appellant,<br><br>    v.<br><br>JEFF TIMMERMAN AND JANE DOE<br>TIMMERMAN, and the marital community<br>composed thereof; SILVERDALE<br>PLUMBING & HEATING, INC., a<br>Washington Corporation,<br><br>               Respondents. | No. 57847-6-II<br><br><br><br>UNPUBLISHED OPINION |

GLASGOW, C.J.—In 2002, Jeff Timmerman was driving a Silverdale Plumbing van when he rear-ended a car where six-year-old Celeste Ryan was a passenger. Matthew Ryan,[1] Ryan's father, was a chiropractor. He later diagnosed Ryan with dysautonomia, a nervous system disorder. In late 2016, when she was 20, Ryan sued Timmerman and Silverdale Plumbing for negligence, seeking about $12 million in damages for injuries she believed she incurred in the accident, including the onset of her dysautonomia.

Ryan and Matthew repeatedly sought to directly contact the defendants after the defense lawyer told them to stop, so the trial court ordered Ryan and her representatives to communicate

---

[1] For clarity, we refer to Celeste Ryan by her surname and Matthew Ryan by his first name.

only with counsel. The trial court later excluded Matthew's testimony entirely as a sanction for continuing to try to contact the defendants.

The defendants sought partial summary judgment, and Ryan failed to timely provide any sworn expert testimony to establish the accident caused her dysautonomia. The trial court granted summary judgment, denied Ryan's motion to exclude the defendants' medical experts, and limited Ryan's claim for general damages to a three-month period after the accident. The trial court later denied Ryan's motion to subpoena the medical experts. A jury awarded Ryan $3,289, which was offset by sanctions and attorney fees to result in a judgment for the defendants of nearly $9,000.

Ryan appeals. She argues that the trial court erred by ordering her and Matthew to stop contacting the defendants directly and by excluding Matthew's testimony as a sanction for violating that order. She contends that the trial court erred by granting the partial summary judgment motion, denying her motion to exclude the defendants' medical experts, and limiting her general damages. Next, she argues that the trial court erred by denying her motion to subpoena the defense medical experts to testify at trial. And she insists that the administration of the trial violated her due process and equal protection rights. Both parties seek attorney fees on appeal.

We affirm. We deny both parties' requests for appellate attorney fees.

FACTS

I. BACKGROUND

In December 2002, Timmerman was driving a Silverdale Plumbing van when he rear-ended a car where six-year-old Ryan was a passenger. In November 2016, when Ryan was 20, she sued Timmerman and Silverdale Plumbing for negligence, seeking over $12 million in damages. She asserted the accident gave her dysautonomia, a nervous system condition that causes

lightheadedness and fainting. An insurance company attorney represented the defendants (collectively referred to as Timmerman).

II. PRELIMINARY PROCEEDINGS

A.     Motion to Prohibit Ryan and Her Representatives from Directly Contacting the Defendants

Matthew appeared uninvited at Timmerman's house several times, speaking first with Timmerman's mother and then with his wife. Matthew said he was trying to reach Timmerman directly and asserted that the insurance company lawyer was lying to the family. Timmerman and his wife "found these visits unusual, concerning, and upsetting." Clerk's Papers (CP) at 31. The defense lawyer sent letters to Ryan stating that his clients did not want Ryan to contact them and that any settlement authority would come from the defendants' insurer through defense counsel. Insurance policies generally give the insurer control over settlement of a lawsuit. *Arden v. Forsberg & Umlauf, P.S.*, 193 Wn. App. 731, 752, 373 P.3d 320 (2016).

Timmerman sought an order prohibiting Ryan and "her representatives from having direct communication with the defendants." CP at 11. Timmerman specifically asked that the trial court order Ryan to comply with RPC 4.2, which prohibits lawyers from contacting a represented opposing party.

In response, Ryan explained she had repeatedly tried to set up settlement conferences to no avail, and she insisted that she had the authority to settle with the defendants directly without approval from the insurance company. She also stated that rules applicable to attorneys did not apply to her and she intended to continue to try to contact the defendants despite their attorney's direction not to. Ryan also claimed that she did not ask her father to contact the defendants.

The trial court granted the motion, telling Timmerman's attorney that his clients could instruct him to allow direct communication with Ryan but "they also have the right to have their matter heard through counsel." Verbatim Rep. of Proc. (VRP) (Nov. 17, 2017) at 3. And it was "clear . . . that your clients don't wish direct communication with the plaintiff." *Id.* The trial court stated that it could not prohibit Matthew from contacting the defendants in the order because he was not a party. The order provided that Ryan "and any of her representatives shall comply with RPC 4.2 and not have any direct or indirect contact [with] the Defendants in this matter. [Ryan] shall direct all of her communications to the Defendants' counsel of record." CP at 752.

B.      Motions for Partial Summary Judgment and to Exclude Defense Medical Experts

1.      Arguments on summary judgment

Discovery closed in December 2017. In January 2018, Timmerman moved for partial summary judgment. He requested dismissal of Ryan's claims for general damages for dysautonomia and all past medical bills over $3,289.

a.      Timmerman's medical evidence

Timmerman asserted that two defense medical experts who had conducted a CR 35 examination of Ryan in 2017, concluded she had neck and back strains from the accident, "which have resolved." CP at 69. The doctors agreed that Ryan was entitled to $3,289 in medical bills. Thus, while Timmerman conceded that the accident caused minor injuries, he asserted that those injuries had since resolved and that Ryan could not demonstrate a causal link between the accident and her ongoing nervous system complaints.

The CR 35 exam report submitted to the trial court was written by an orthopedic surgeon and a chiropractor and sworn under penalty of perjury. The report listed the records the doctors

reviewed as well as the tests they conducted and the results and probable diagnoses. This included a battery of neurological tests. A neurologist also reviewed Ryan's medical records. All three defense medical experts were certified as independent medical examiners by state or national boards.

The report concluded that Ryan's injuries from the accident consisted of "minor soft tissue strains" that reached maximum medical improvement in March 2003. CP at 260. The doctors concluded that Ryan's current complaints were likely not related to the accident. They also disputed whether she had dysautonomia at all. The CR 35 report concluded that there was no permanent neck injury, and that some of Ryan's complaints could be from a "benign" nerve pinching condition in her elbows. CP at 261. The neurologist observed "very mild, probably clinically insignificant degenerative changes" in several of Ryan's spinal discs. CP at 330. Ryan's report of lightheadedness was not supported "by objective findings on vital sign testing, clinical examination, or detailed autonomic [nervous system] testing." CP at 327.

Timmerman also noted that in Matthew's deposition, he declined to offer any opinion on Ryan's injuries or "exams and recovery and prognosis," because he did not "have an active license . . . to act in a medical capacity" and therefore could not give "a medical opinion," including any opinion on what treatment was reasonable as a result of the accident. CP at 68, 88.

Timmerman also submitted records from a neurologist Ryan visited in January 2017. That neurologist reported that Ryan appeared to demonstrate "[o]rthostatic intolerance," but he did not diagnose her with a specific disease or disorder. CP at 92. At a later visit, the neurologist declined to identify a causal link between the accident and Ryan's complaints.

b.    Ryan's medical evidence

In response, Ryan asserted that images of her spine showed a permanent injury and the injury was causally linked to the accident. She cited to a "Medical Summary" Matthew produced the day before his California chiropractic license expired. CP at 118.

The summary asserted that the accident caused Ryan "nervous system injuries" that resulted in "central nervous system and autonomic nervous system abnormalities and dysreflexia[]." CP at 122. The summary did not identify any testing that Matthew performed to diagnose Ryan with nervous system problems or establish his qualifications for doing so as a chiropractor. The summary was not signed under any oath or penalty of perjury.

Next, a radiologist who reviewed images of Ryan's spine found mild changes to her spine curvature and movement but no evidence of permanent ligament damage. And another chiropractor who x-rayed Ryan's spine in late 2016 found that some spinal discs had begun to degenerate. The chiropractor did not indicate what might have caused the damage. None of the medical records Ryan submitted were attached to declarations sworn under penalty of perjury. Nor did she provide declarations attesting to the authenticity of those records.

The day before the summary judgment hearing, Ryan filed a surreply. She attached a sworn declaration from Matthew asserting that he was Ryan's treating physician and "a qualified expert with specialized medical knowledge, training[,] and experience." CP at 402.

Matthew stated that Ryan had permanent "spinal and neurological conditions received as a direct and proximate result of the accident." CP at 413. He stated that Ryan's complaints were common for people diagnosed with dysautonomia "due to the autonomic neurological/vascular complexity of that condition." CP at 409. He also stated that Ryan's "neurological condition" was

6

"verified by a reliable, reproducible testing method, and with unequivocal positive test result for that condition." CP at 411. He did not specify what the test was or which doctor performed it.

All of Matthew's qualifications related to chiropractic work; he did not provide any proof that he was qualified to diagnose or treat neurological or nervous system disorders. RCW 18.25.005(1) prescribes the limits of chiropractic practice, providing, "Chiropractic is the practice of health care that deals with the diagnosis or analysis and care or treatment of the vertebral subluxation complex and its effects, articular dysfunction, and musculoskeletal disorders." The statute does not mention neurological or nervous system disorders.[2]

### 2. Hearing and trial court ruling

At the hearing, the trial court informed Ryan that it could not consider her surreply, including Matthew's declaration, "because it wasn't filed timely." VRP (Feb. 23, 2018) at 2; *see also* CR 56(c), (f) (requiring responsive documents to be filed 11 days before a summary judgment hearing but allowing continuances to further develop evidence). Ryan did not ask for a continuance or extension of the discovery cutoff. The trial court explained that, to survive summary judgment, Ryan needed to present a prima facie case of the elements of her claim. But Ryan had not produced admissible evidence to support her claim that the accident caused her dysautonomia. In particular, Matthew was not "an admissible expert witness unless he can give a medical opinion as it relates to this claim." VRP (Feb. 23, 2018) at 17. Thus, the trial court granted the motion for partial summary judgment and dismissed all of Ryan's claims for past medical bills over $3,289. Ryan moved for reconsideration of the summary judgment ruling, and the trial court denied the motion.

---

[2] Further, "unprofessional conduct" under the chapter regulating chiropractic practice "includes failing to differentiate chiropractic care from any and all other methods of healing at all times." RCW 18.25.112(1).

### 3. Arguments regarding defense experts

The same day that she filed her initial response to the summary judgment motion, Ryan moved to exclude all of Timmerman's medical expert opinions and testimony. Ryan argued that the experts were biased and would mislead the jury. The trial court denied the motion. It explained that Ryan was primarily raising credibility issues that were best addressed by cross-examining the experts if called at trial.

### 4. Later proceedings related to summary judgment and monetary sanctions

Several days after the summary judgment hearing, Timmerman sent Ryan a CR 68 offer of judgment for $10,300, which she did not accept. In addition, Ryan incurred several thousand dollars in additional sanctions and attorney fees for delaying trial and for bringing a frivolous motion for discretionary review.

## C. Motion to Exclude Matthew's Testimony

After the order prohibiting Ryan and her representatives from contacting the defendants, Matthew tried several times to contact Silverdale Plumbing's owner. In August 2019, Timmerman moved to sanction Ryan for violating the court's order.

The husband of Silverdale Plumbing's owner filed a declaration stating that Matthew e-mailed both the husband and his brother stating their attorney was being dishonest and encouraging them to have the owner contact Matthew. After the motion for sanctions, Matthew contacted the brother again, accusing the husband of committing perjury.

Timmerman moved to either exclude Matthew as a witness or dismiss the case entirely. He argued that the sanctions in chapter 7.21 RCW did not apply and requested that the court use its inherent authority to sanction instead. Timmerman reasoned that excluding Matthew from

testifying was appropriate because he was "intimately involved" in the case and "repeatedly attempted to improperly interject himself" in violation of the court's order. CP at 731. And with Ryan already owing thousands in sanctions and attorney fees, further monetary sanctions would be an inadequate deterrent. Timmerman's attorney contended that Matthew acted in bad faith, trying to drive a wedge between the attorney and his clients.

Ryan insisted that Matthew was not acting as her representative and sought sanctions against Timmerman's attorney. She also contended that there was no bad faith because Matthew had "no ulterior motive" except to warn the defendants they were "being defrauded." VRP (Sept. 13, 2019) at 14, 18. She insisted she would not be deterred by additional sanctions, saying the court could sanction her "a billion dollars." CP at 837.

The trial court found the "intent of the message" was to reach Silverdale Plumbing's owner, which constituted trying to contact a defendant directly. VRP (Sept. 13, 2019) at 17. And because the communications were intended to settle the case, Matthew was acting as Ryan's representative and issuing "veiled threats" that violated the prior court order. *Id*. at 25.

The trial court found that Ryan, through Matthew, violated the prior order in bad faith. It found that the sanctions authorized by chapter 7.21 RCW did "not adequately apply under the circumstances" and instead excluded Matthew from testifying. CP at 938.

D.      Motion to Limit General Damages

In October 2019, Timmerman moved to limit Ryan's claims for general damages to the three months after the accident. Timmerman explained that based on the partial summary judgment ruling, "no treatment after March 2003 was reasonable." CP at 915. And Timmerman

acknowledged that if his motion was granted he would not "call any medical experts or even witnesses at trial." CP at 916.

Ryan primarily argued that she should be permitted to cross-examine the medical experts. She also asked the judge to recuse due to "the appearance of bias." VRP (Oct. 11, 2019) at 6. The judge stated that she saw "no basis for which to recuse" and pointed out that she had already made several discretionary rulings, which prevented Ryan from disqualifying her under RCW 4.12.050(1)(a). *Id*. at 7. The trial court granted the motion to limit general damages because Ryan failed to challenge the motion "on a legal basis" and did not offer opposing medical expert testimony. *Id*.

E.      Motion to Subpoena Defense Experts

Timmerman acknowledged that the defendants were liable for Ryan's special damages, specifically her reasonable medical bills incurred in the three months after the accidents in the amount of $3,289. Having limited the scope of trial to determining Ryan's general damages in the three months after the accident, Timmerman no longer planned to call his medical experts to testify. In November 2019, Ryan moved for a subpoena directing the doctors who conducted the CR 35 exam to testify at trial. Because Ryan could not explain how the experts' testimony was relevant to the issues remaining for trial, the trial court denied subpoena.

III. TRIAL

Trial was set for March 2020 when the COVID-19 pandemic closures began. Trial eventually occurred in December 2022. The delay was partially because the superior court prioritized clearing the backlog of criminal cases once restrictions loosened enough to conduct

trials again. Once trials resumed, Timmerman suggested a bench trial to speed the process but Ryan refused.

Ryan was the only witness at trial. The sole issue was general damages between December 2002 and March 2003. In addition to her special damages in the amount of her medical bills, Ryan sought $1,400,950 for pain and loss of enjoyment.

The jury awarded Ryan her $3,289 in medical bills and nothing in general damages. After offsetting the prior monetary sanctions against Ryan, including statutory costs because the judgment was less than Timmerman's CR 68 offer, the trial court entered a judgment of roughly $9,000 for Timmerman.

Ryan appeals.

## ANALYSIS[3]

### I. PROHIBITION ON DIRECTLY CONTACTING THE DEFENDANTS

A.  <u>Order to Refrain from Contacting Defendants</u>

Ryan argues that the trial court erred by ordering her and her representatives to comply with RPC 4.2 and cease trying to directly contact the defendants. We disagree.

RPC 4.2 requires lawyers representing clients to "not communicate about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized to do so by law or a court order." Timmerman does not point to any authority stating that RPC 4.2 applies to parties who are not attorneys. He relies on cases more generally stating that unrepresented nonlawyers are subject

---

[3] Ryan argues that the trial court was biased against her and that we should therefore apply a de novo standard of review to every issue. But after a careful review of the record, we disagree with the assertion that the trial court was biased against Ryan.

to the same substantive and procedural laws as lawyers, but none of those cases has held that an unrepresented nonlawyer is subject to the RPCs. *See In re Marriage of Wherley*, 34 Wn. App. 344, 349, 661 P.2d 155 (1983); *Bly v. Henry*, 28 Wn. App. 469, 471, 624 P.2d 717 (1980). Nevertheless, the trial court has broad discretion to make trial management decisions. *State v. Gorman-Lykken*, 9 Wn. App. 2d 687, 691, 446 P.3d 694 (2019).

Here, Timmerman's attorney explained to Ryan that only the insurance company had authority to settle with her, but the Ryans continued to try to reach the defendants by showing up at their homes and contacting their relatives to try to settle the case. *See Arden*, 193 Wn. App. at 752 (explaining that the insurer, not the insured, typically has authority to settle). Thus, Ryan knew that her attempts to directly contact the defendants would not have any substantive effect on the outcome of the case. Moreover, the defendants expressly told the court that they wanted Ryan to communicate only with counsel. Ryan suggests that the trial court could not prohibit contact between the parties unless Timmerman sought a no contact order, but given the trial court's broad authority to manage the cases before it, the court also had discretion to enter an order, limited to the time when litigation was ongoing, preventing unwanted contact.

While the RPCs do not inherently apply to nonlawyers, the trial court has discretion to make trial management decisions including preventing harassment of the parties. Importantly, the trial court acknowledged that the parties could talk to each other if they wanted to, but here, the defendants clearly did not want to be contacted. As such, the trial court was not necessarily applying RPC 4.2, but was instead ordering Ryan and Matthew to follow the parameters of the rule due to their prior actions, even though they would not normally be subject to the rule. Thus,

we hold that the trial court did not abuse its discretion by ordering Ryan and her representatives to comply with in RPC 4.2 and contact the defendants only through counsel.

B.      Sanctions for Violating Order

Ryan next argues that the trial court erred by sanctioning her for her father's conduct. She reasons that Matthew was not her representative because he was not acting as her legal representative or guardian. She also insists that the husband of Silverdale Plumbing's owner was not a party to the case, so contact with him did not violate the order. And Ryan argues that the trial court should have sanctioned Timmerman as punishment for filing the sanctions motion. We disagree.

1.      Cases and statutes governing sanctions

We review a trial court's order imposing sanctions for abuse of discretion. *Moreman v. Butcher*, 126 Wn.2d 36, 40, 891 P.2d 725 (1995). "An abuse of discretion is present only if there is a clear showing that the exercise of discretion was manifestly unreasonable, based on untenable grounds, or based on untenable reasons." *Id.*

There are statutory restrictions that apply when a contempt sanction is imposed. *See* RCW 7.21.030(2), .040(2). But separate from sanctions under the contempt statute, a trial court may "fashion and impose appropriate sanctions under its inherent authority to control litigation." *In re Firestorm 1991*, 129 Wn.2d 130, 139, 916 P.2d 411 (1996). The court's inherent power to sanction is vested in the court to ensure it can dispose of cases in an orderly and expeditious manner. *State v. S.H.*, 102 Wn. App. 468, 475, 8 P.3d 1058 (2000). A court has "inherent authority to sanction lawyers for improper conduct during the course of litigation" if it finds the conduct was in bad faith. *State v. Merrill*, 183 Wn. App. 749, 755, 335 P.3d 444 (2014). And a court may sanction a

13

pro se litigant as it would an attorney for their litigation conduct. *See, e.g., In re Recall of Lindquist*, 172 Wn.2d 120, 136, 258 P.3d 9 (2011). Bad faith conduct includes that which delays or disrupts litigation. *S.H.*, 102 Wn. App. at 475. "Sanctions may be appropriate if an act affects 'the integrity of the court and, [if] left unchecked, would encourage future abuses.'" *Id*. (alteration in original) (quoting *Gonzales v. Surgidev,* 120 N.M. 151, 899 P.2d 594, 600 (1995)).

For example, in *Merrill*, a defense attorney contacted victims directly to discuss the plea agreement despite knowing that the victims wished to communicate only with a victim advocate present. 183 Wn. App. at 752. The attorney contacted the victims again after the State informed him that it would pursue sanctions for the first contact. *Id*. at 752-53. Division Three affirmed the trial court's finding that the second contact was in bad faith, because that contact was made "despite the pending motion for sanctions for the very same conduct," justifying sanctions. *Id*. at 756.

2.      The sanction in this case

Here, the trial court's order directed that Ryan and "her representatives shall comply with RPC 4.2 and not have any direct or indirect contact with the Defendants" and "shall direct all of her communications to the Defendants' counsel." CP at 752. After the order, Matthew tried several times to contact Silverdale Plumbing's owner through her husband and brother-in-law.

The trial court found that Ryan and Matthew violated the order prohibiting contact in bad faith. The trial court found that the communications were intended to settle the case and the messages were "veiled threats." VRP (Sept. 13, 2019) at 25. It also found that the sanctions authorized by chapter 7.21 RCW did "not adequately apply under the circumstances" and therefore excluded Matthew from testifying rather than any remedial sanction. CP at 938.

It was not untenable to construe the prohibition against indirect contact with the defendants to include the husband and brother-in-law of Silverdale Plumbing's owner when the contact was clearly intended to reach the owner. Nor was it unreasonable to find that Matthew acted as Ryan's representative when he encouraged the opposing party to engage in settlement negotiations, find a different lawyer, and amend filings. Thus, there was substantial evidence to support the conclusion that Matthew and Ryan violated the court's prior order in bad faith. There was also substantial evidence to support the finding that chapter 7.21 RCW sanctions were insufficient. Ryan and Matthew repeatedly operated under their own interpretation of the law, despite explanations and court orders to the contrary, and they maintained throughout proceedings that they did not have to play by the same rules as the attorneys they faced.

We hold that the trial court did not abuse its discretion by excluding Matthew's testimony as a sanction for violating the court's order prohibiting contact with the defendants. And the trial court did not err by declining to sanction Timmerman for filing a meritorious sanctions motion.

II. PARTIAL SUMMARY JUDGMENT

Next, Ryan argues that she produced evidence of a genuine issue of material fact regarding a causal link between the accident and her dysautonomia. Specifically, she asserts that the "summary report" Matthew produced, which diagnosed her with dysautonomia and stated the condition was caused by the accident, was sufficient to create a genuine issue of material fact. Br. of Appellant at 29. Ryan argues the summary was admissible even though it was not a sworn statement, relying in part on the business records exception to the rule against hearsay. She also reasons that her injury was not beyond a lay person's knowledge, so she did not need expert testimony to establish its cause. We disagree.

15

A.    Summary Judgment and Complex Medical Claims

We review a summary judgment decision de novo, engaging in the same inquiry as the trial court. *Int'l Ultimate, Inc. v. St. Paul Fire & Marine Ins. Co.*, 122 Wn. App. 736, 744, 87 P.3d 774 (2004). A defendant is entitled to summary judgment if the plaintiff fails to make a prima facie showing of an essential element of their claim. *Young v. Key Pharm., Inc.*, 112 Wn.2d 216, 225, 770 P.2d 182 (1989). "A party may not rely on mere allegations, denials, opinions, or conclusory statements." *Int'l Ultimate*, 122 Wn. App. at 744. Affidavits opposing summary judgment must be made on personal knowledge, set forth admissible evidence, and "show affirmatively that the affiant is competent to testify to the matters stated therein." CR 56(e). And a "court may not consider inadmissible evidence when ruling on a motion for summary judgment." *King County Fire Prot. Dists. No. 16, No. 36 & No. 40 v. Hous. Auth. of King County*, 123 Wn.2d 819, 826, 872 P.2d 516 (1994). Thus, under ER 901, documents attached to declarations must be authenticated. *Int'l Ultimate*, 122 Wn. App. at 745-46.

A plaintiff suing for negligence must demonstrate the existence of a duty, a breach of that duty, a resulting injury, and that the breach proximately caused the injury. *Ranger Ins. Co. v. Pierce County*, 164 Wn.2d 545, 552, 192 P.3d 886 (2008). "If any of these elements cannot be met as a matter of law, summary judgment for the defendant is proper." *Id*. at 553.

"'In general, expert testimony is required when an essential element in the case is best established by an opinion which is beyond the expertise of a layperson.'" *Rinehold v. Renne*, 198 Wn.2d 81, 92, 492 P.3d 154 (2021) (internal quotation marks omitted) (quoting *Berger v. Sonneland*, 144 Wn.2d 91, 110, 26 P.3d 257 (2001). "Medical facts in particular must be proven by expert testimony unless" a layperson can observe and describe them without medical training.

16

*Harris v. Robert C. Groth, M D, Inc.,* 99 Wn.2d 438, 449, 663 P.2d 113 (1983); *see L.M. by & through Dussault v. Hamilton*, 193 Wn.2d 113, 137, 436 P.3d 803 (2019). Thus, expert testimony is generally necessary to establish "most aspects of causation" in personal injury cases involving "obscure medical factors." *Harris*, 99 Wn.2d at 449; *Riggins v. Bechtel Power Corp.*, 44 Wn. App. 244, 254, 722 P.2d 819 (1986). "[M]edical testimony must be based on the facts of the case and not on speculation or conjecture." *Fabrique v. Choice Hotels Int'l, Inc.*, 144 Wn. App. 675, 687, 183 P.3d 1118 (2008).

Finally, an unrepresented litigant "is held to the same rules of procedural and substantive law as an attorney," including deadlines. *In re Decertification of Martin*, 154 Wn. App. 252, 265, 223 P.3d 1221 (2009).

B.      Partial Summary Judgment in This Case

To begin, as a nervous system condition that required neurological testing to diagnose, dysautonomia was certainly beyond a lay person's expertise. Therefore, medical testimony was necessary to establish both injury and causation. *Rinehold*, 198 Wn.2d at 92.

Timmerman produced a CR 35 medial report and a separate neurologist report that disputed the existence of a causal link between Ryan's complaints and the accident. The experts also questioned whether Ryan actually had dysautonomia because they could not find evidence of a permanent neck injury and they could not make objective findings that would support her physical complaints. And when asked, Ryan's neurologist refused to identify a causal link between the accident and Ryan's complaints.

The only timely evidence of a causal link between the accident and any long-term injury was the "Medical Summary" Matthew produced in 2016, 14 years after the accident. CP at 118.

17

The medical summary was not sworn under oath and Ryan did not timely provide any evidence of authentication. Importantly, Matthew refused to offer expert opinions during his deposition because he was not licensed. Ryan produced no other timely evidence that the accident caused her condition.

Not until the day before the summary judgment hearing, after the discovery cutoff and the deadline for submitting responsive evidence, did Ryan file a surreply with Matthew's sworn declaration asserting that the accident caused Ryan's condition. At the hearing, Ryan stated that she did not know that medical testimony needed to be sworn under oath and assumed that her medical records were automatically admissible. She did not have another explanation for why she was late filing the surreply and Matthew's declaration.

Responsive evidence is due 11 days before a summary judgment hearing under CR 56(c). *See also* KCLCR 7(b)(1)(A). Ryan did not seek a continuance or ask to reopen discovery to gather more evidence under CR 56(f). Setting aside Ryan's late materials, the trial court concluded that Ryan had not produced admissible evidence to support her claim because she lacked sworn expert testimony to support a causal link between the accident and her complaints.

Further, the timely summary from Matthew asserting a causal link between the accident and Ryan's dysautonomia, was not authenticated by any sworn statement. *Int'l Ultimate*, 122 Wn. App. at 745-46. Nor did the summary explain how Matthew was qualified to testify on the cause of neurological symptoms. And Ryan's medical records were not automatically admissible under the business records exception to hearsay, because even "routine records created in the normal course of business may be inadmissible if they contain conclusions or opinions based on the preparer's special degree of skill or discretion." *In re Welfare of M.R.*, 200 Wn.2d 363, 380, 518

P.3d 214 (2022). Thus, the only admissible medical expert evidence before the trial court at summary judgment was Timmerman's CR 35 report challenging both the injury and causation elements of Ryan's negligence claim.

The trial court did not err by concluding that Ryan failed to make a prima facie showing of an essential element of her claim, causation. The trial court properly dismissed of Ryan's claims related to dysautonomia and her claims for past medical bills beyond $3,289.00, the amount she incurred in the three months after the accident. We affirm the order granting partial summary judgment.

### III. MOTION TO EXCLUDE DEFENSE MEDICAL EXPERTS

CR 35(a)(1) allows a party to seek "a physical examination by a physician" when the opposing party's "physical condition . . . is in controversy," resulting in a report. Ryan argues that the trial court abused its discretion by denying her motion to exclude Timmerman's medical experts and their CR 35 report. She believes that the experts violated their professional licenses during the CR 35 exam because their conclusions were "pre-meditated" and "fraudulent." Br. of Appellant at 44. We disagree.

"We review a trial court's decision to admit or exclude evidence for abuse of discretion." *City of Kennewick v. Day*, 142 Wn.2d 1, 5, 11 P.3d 304 (2000). A trial court abuses its discretion when it bases its decision on untenable grounds or reasons. *Id*.

ER 702 allows the admission of expert testimony and reports if "specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." Expert testimony is generally admissible if the expert is qualified, they rely "on generally accepted theories in the scientific community," and "the testimony would be helpful to the trier of fact."

*Johnston-Forbes v. Matsunaga*, 181 Wn.2d 346, 352, 333 P.3d 388 (2014). We will not disturb a trial court's ruling if the basis for admitting the evidence is fairly debatable. *Id*. A party claiming unfair bias "must produce sufficient evidence demonstrating bias . . . mere speculation is not enough." *Magula v. Dep't of Lab. & Indus.*, 116 Wn. App. 966, 972, 69 P.3d 354 (2003).

In this case, the defense medical experts concluded that most of Ryan's physical complaints were not related to the accident. Their report was made under oath, explained the tests they conducted, and concluded that Ryan's injuries from the accident consisted of minor soft tissue strains that reached maximum medical improvement in March 2003.

Ryan produced no evidence that the experts were not qualified, that they were using invalid theories or methods, or that their conclusions were not relevant. *Johnston-Forbes*, 181 Wn.2d at 352. Except for Matthew's untimely declaration, which the trial court declined to consider, Ryan relied entirely on her own assertions that the experts deviated from a reliable methodology generally accepted by the relevant scientific community.

The trial court did not abuse its discretion by concluding that Ryan was challenging the experts' credibility, not the admissibility of their testimony or reports. The trial court did not err by denying the motion to exclude the experts. Ryan also contends the trial court improperly ruled on her motion after deciding the summary judgment motion. We discern no prejudice from the order in which the court ruled on motions.

IV. MOTION TO LIMIT GENERAL DAMAGES

Next, Ryan argues that the trial court improperly weighed the evidence when it granted Timmerman's motion to limit general damages to the three months after the accident. We disagree. The trial court's ruling on partial summary judgment effectively limited Ryan's claim for general

damages to the three months after the accident. Because the trial court did not err in granting partial summary judgment, the order limiting Ryan's claim to the time period delineated by that summary judgment ruling was likewise proper.[4] We affirm the order limiting Ryan's general damages.

## V. MOTION TO SUBPOENA DEFENSE MEDICAL EXPERTS

Next, Ryan argues that the trial court erred by denying her motion to subpoena Timmerman's medical experts after Timmerman decided not to call those experts at trial. We disagree.

The trial court ruled that the defense medical experts were not relevant to the remaining issues at trial. The partial summary judgment ruling was proper, so the trial court was correct to conclude that any testimony about Ryan's condition at the time of the CR 35 examination would have been outside the scope of issues on trial. The jury did not hear any testimony or receive any evidence about the CR 35 examination, so impeaching the experts about the exam would not have yielded any probative evidence regarding any issue that was on trial.

We hold that the trial court did not err by denying Ryan's motion to subpoena Timmerman's medical experts because their testimony was not relevant to the issue on trial.

## VI. TRIAL ADMINISTRATION

Ryan argues that the trial court violated her rights under article I, section 10 of the Washington Constitution by repeatedly continuing the trial. She asserts that the trial judge should have recused to let another judge conduct the trial sooner. We disagree.

---

[4] Ryan then contends that the trial court should have sent the case to arbitration rather than allowing it to proceed to trial on such limited issues. But the record shows Ryan resisted when Timmerman sought to have the case sent to arbitration, so the invited error doctrine prevents our review of this contention. *See In re Marriage of Lesinski & Mienko*, 21 Wn. App. 2d 501, 510, 506 P.3d 1277 (2022).

Article I, section 10 provides, "Justice in all cases shall be administered openly, and without *unnecessary* delay." (emphasis added). However, under CrR 3.3(a)(2), "[c]riminal trials shall take precedence over civil trials." Ryan herself requested several continuances, including one that resulted in her paying several thousand dollars of fees to Timmerman's expert witnesses. She did not specifically identify objectionable continuance orders in her notice of appeal. At least some of the delays were due to court closures because of the COVID-19 pandemic, and then from clearing the resulting backlog of criminal trials. And Ryan cites no authority giving civil plaintiffs a right to a speedy trial comparable to that afforded criminal defendants. Finally, Ryan does not show how transferring the case to a different judge would have expedited the trial. We reject this constitutional argument.

Ryan also argues that the entire Washington trial system awards attorneys "special privileges, which prejudice the self-represented litigant" in violation of article I, section 12. Br. of Appellant at 64. She argues that attorneys are "held in higher esteem by the courts," receive "unfettered access" to the court record, have a subpoena power that unrepresented litigants do not, and have access to an electronic filing system that unrepresented litigants do not. *Id*. at 64-65.

Article I, section 12 provides, "No law shall be passed granting to any citizen, class of citizens, or corporation other than municipal, privileges or immunities which upon the same terms shall not equally belong to all citizens, or corporations." A privileges and immunities clause claim first requires a legislative classification. *Int'l Franchise Ass'n v. City of Seattle*, 803 F.3d 389, 411 (9th Cir. 2015). The fact that certain court systems and procedures may be more familiar to attorneys than to untrained, unrepresented litigants, does not constitute a legislative classification,

22

and Ryan has failed to identify a particular legislative classification that creates the disparity she complains about. We reject this constitutional argument as well.

## ATTORNEY FEES

Both parties seek attorney fees on appeal. Ryan does not prevail on any issue. We deny her request for fees. Timmerman requests attorney fees under RAP 18.9(a) as a sanction for a frivolous appeal. Although she does not prevail, Ryan's appeal was not frivolous. We deny Timmerman's request for fees on appeal.

## CONCLUSION

We affirm. We deny both parties' requests for appellate attorney fees.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_Glasgow, CJ_

Glasgow, C.J.

We concur:

_Cruser, J._

Cruser, J.

_Veljaci, J._

Veljaci, J.